NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 4, 2020
Decided August 12, 2020

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 19-2822

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. |
| *v.* | No. 2:17CR65-001 |
| LUCY OWENS, *Defendant-Appellant*. | Joseph S. Van Bokkelen, *Judge*. |

**O R D E R**

After a jury found Lucy Owens guilty of wire fraud, three psychological reports assessed whether Owens had a mental illness that prevented her from distinguishing reality from fiction. At sentencing, Owens argued that her condition warranted a sentence of house arrest, not prison, but the district court disagreed. Relying on the third report, which said that Owens did not have "hallucinations" or "delusions" (though she had other mental impairments), it imposed a term of 57 months in prison— the top of the Guidelines range. On appeal, Owens argues that the court did not adequately address her arguments about her mental illness. We conclude that the court sufficiently addressed and reasonably rejected Owens's contention that hallucinations and delusions affected her actions, so we affirm.

While working as an accounts-payable clerk for a trucking company from 2010 to 2015, Owens paid herself nearly $850,000 through interstate wire transfers. At her trial on charges that these transfers were unauthorized and therefore wire fraud, Owens maintained that she believed her boss had permitted her to take the money. A jury found Owens guilty on seven counts of wire fraud. 18 U.S.C. § 1343.

After trial, the issue of Owens's mental health arose. During a presentencing interview, Owens reported a history of untreated mental-health issues, so the court ordered that she be evaluated and treated; this process took a year. Three psychologists assessed whether Owens displayed symptoms of a serious mental illness—including "delusions," "dissociation," and "derealization."

We briefly define these three terms. A "delusion" is a "false belief maintained … in spite of incontrovertible … proof … to the contrary." *See Delusion*, *Dorland's Medical Dictionary*, ELSEVIER, https://www.dorlands.com/dorlands/def.jsp?id=100028137 (last visited August 7, 2020). So a "delusional disorder" is a cognitive impairment "marked by well-organized, logically consistent delusions" though "[m]ost functioning is not markedly impaired." *Disorder*, *Dorland's Medical Dictionary*, ELSEVIER, https://www.dorlands.com/dorlands/def.jsp?id=100031622 (last visited August 7, 2020). A "dissociation" is an impairment characterized by the "segregation of a group of mental processes from the rest of a person's … consciousness." *Dissociation*, *Dorland's Medical Dictionary*, ELSEVIER, https://www.dorlands.com/dorlands/def.jsp?id=1000 31746 (last visited August 7, 2020). It can warp perception, degrade memory, and cause patients to become unable to discern truth from reality because their thought patterns are so disjointed. *Dissociative Disorders*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/dissociative-disorders/symptoms-causes/syc-20355215 (last visited August 7, 2020). Finally, "derealization" is the loss of sense of "the reality of one's surroundings." *Derealization*, *Dorland's Medical Dictionary*, ELSEVIER, https://www.dorlands.com/dorlands/def.jsp?id=100028605 (last visited August 7, 2020).

The first psychologist, Dr. James Bovan, treated Owens for six months beginning in mid-2018 and concluded that she experienced auditory hallucinations, delusional thinking (paranoia), emotional instability, and large memory gaps caused by impaired "cognitive functioning for proper memory encoding." Though Owens's symptoms did not affect her "mental status for things such as Person, Place, or Time," the doctor emphasized that "knowing where, when and who she is doesn't preclude disruption to rational thought and decision making." Moreover, a sense of derealization, combined with her memory loss left Owens uncertain about what happened in her past and

unsure if something "really happened or if it was a dream." With treatment, Owens's hallucinations decreased to "near elimination," but other symptoms persisted: "paranoid thoughts" continued to trigger memory gaps and emotional outbursts, and "her perception of reality continue[d] to be variable given her uncertainty of what was real." Indeed, "[e]ven with medications" and treatment, "the clarity in her thought process has only lessened her certainty … regarding her past actions." Dr. Bovan thus considered Owens to be a "questionable reporter of her own experience."

The second evaluation, by forensic psychologist Dr. Gary Durak in March 2019, also found that Owens had a "lifelong untreated serious SMI" (Serious Mental Illness). It stated that Owens showed symptoms of "thought disorders" including "unusual thoughts and perceptions" and "possible psychotic symptoms with delusions," and "symptoms related to dissociations including … derealization." Further, Dr. Durak opined that given the success of her post-trial treatment, her earlier lack of treatment likely "played a role in her choices … related to her alleged criminal conduct," and that "appropriate Mental Health treatment would reduce the risk of her re-offending." So, he concluded, a sentence of house arrest (in which Owens could continue treatment) instead of prison was appropriate.

The third report, prepared in June 2019 to evaluate Owens's competence to appear at sentencing, came to a different conclusion. Dr. Amor Correa, a psychologist at the Bureau of Prisons, discredited Owens's self-reports of hallucinations and delusions as "exaggerated or feigned." Owens's report of a longtime, imagined friend resembled a plot device from the movie *A Beautiful Mind*. The movie retold the life of a man with schizophrenia who was depicted as having a lifelong imaginary companion, but that depiction was "created for cinematic effect" and did not reflect "[t]rue hallucinations," which are fleeting. Owens may have "mild paranoia involving fears that others are speaking negatively of her," but not "perception-like physiological experiences" "typically observed in individuals with a genuine psychotic disorder." Owens could also "understand the nature and consequences of the proceedings" and nothing would "prevent her from assisting her attorney in her defense." Although Dr. Correa found that Owens had no delusions or hallucinations, she acknowledged that Owens "complained of forgetfulness, difficulty concentrating, and sometimes struggling to know whether events really happened or if they were 'a dream.'" These complaints were consistent with "dissociative experiences" as well as the "derealization" noted by Dr. Bovan and Dr. Durak.

The probation officer then prepared a presentence investigation report. He calculated an offense level of 23, which included a two-step enhancement for obstruction of justice based on Owens's trial testimony that she had permission to take the money she stole and that she had no knowledge of the actions of two accomplices. Combined with her criminal-history level of I, the imprisonment range under the Sentencing Guidelines was 46–57 months. Although he acknowledged evidence of Owens's mental-health issues, the officer nonetheless faulted her for not "accept[ing] responsibility for her criminal conduct" and recommended a sentence of 52 months' imprisonment.

The parties submitted their recommendations. Owens argued that psychotic delusions prevented her from understanding that she was breaking the law, noted that she was unlikely to receive needed treatment in prison, and requested an 18-month period of home confinement. Owens's counsel construed Dr. Correa's evaluation as implying that Owens could not differentiate between fact and fiction and validating as genuine her belief that she had permission to take the money. The government argued for a 71-month term of imprisonment—the top of the range that would result if the court adopted an alternate Guidelines calculation that included an enhancement for criminal conduct involving sophisticated means. It cited the seriousness of the offense, her "blatantly false testimony," and her belated, fraudulent attempt to argue that she was incompetent. It further characterized the reports of Dr. Bovan and Dr. Durak as "conclusory" and "based almost exclusively" on Owens's self-reports, and therefore just "another ploy to avoid taking responsibility for her crimes."

Sentencing followed. The district court adopted the findings in Dr. Correa's report and concluded that Owens's reports of "hallucinations" were "exaggerated and fabricated." The court emphasized that "[n]one of the reports" suggested that "she did not understand what she was doing was wrong." It ruled that when she committed her crimes she accurately perceived reality:

> I think she probably has convinced herself at this point that she didn't do anything wrong. But that wasn't what she understood at the time she was doing it. And that's what the BOP people are saying, that she knew exactly what she was doing and these hallucinations and stuff like that have been … a made up thing, which she now buys into.

When counsel insisted that all three reports stated that Owens was delusional, the court replied that "most" criminal defendants have "some mental health issues."

The court then rejected the government's request to apply the sophisticated-means enhancement, adopted the Guidelines range in the PSR, and imposed a maximum Guidelines sentence of 57 months in prison. It cited the seriousness of the offense, including the large loss and long duration of the crime, as well as Owens's attempts to "lie her way out" of it and "fabricate[] a claim of mental incompetency." The court nonetheless recognized that she had mental-health concerns, so it would ensure that she was imprisoned where she could be treated. Finally, the court asked the defense if it had adequately addressed her mitigating arguments, and counsel said it had.

On appeal, Owens argues that her sentence is unreasonable because the district court inadequately addressed her arguments about her delusions. (Owens arguably forfeited this challenge because counsel stated at the sentencing hearing that the court properly discussed her arguments. *United States v. Donelli*, 747 F.3d 936, 941 (7th Cir. 2014). Nonetheless, the government has not raised forfeiture, so this court may address Owens's arguments. *See United States v. Herrera-Valdez*, 826 F.3d 912, 917 (7th Cir. 2016).) Owens accepts that the district court discussed and (rejected) her argument about hallucinations. But she contends that the court's analysis is faulty in three ways: First, the court brushed off the reports about her "delusions" by saying that "most" criminal defendants have mental-health issues; Second, it focused on her ability to distinguish right from wrong instead of weighing the impact of her psychosis on her choices; Third, it conflated the question of mental health with the question of competence to stand for sentencing.

Owens's briefs did not clarify whether she considers the court's alleged errors to be procedural or substantive; during argument, she stated that sentencing was both procedurally and substantively unreasonable, and emphasized that the errors amounted to a failure to consider the sentencing factors in 18 U.S.C. § 3553(a)—a procedural challenge. *Gall v. United States*, 552 U.S. 38, 51 (2007). The distinction is important because we review the sentencing court's procedure de novo, *United States v. Pennington*, 908 F.3d 234, 238 (7th Cir. 2018), but we review the substantive reasonableness of a sentence only for abuse of discretion and will uphold it if the district court's explanation shows that it "considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority," *United States v. Vasquez-Abarca*, 946 F.3d 990, 993 (7th Cir. 2020) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007).

Nonetheless, Owens's argument fails under either standard because the district court properly considered the § 3553(a) factors and adequately addressed Owens's arguments about her delusions. First, as Owens requested, the court considered the three reports that evaluated whether she experienced hallucinations and delusions, but permissibly adopted Dr. Correa's assessment that Owens's asserted hallucinations were "feigned" and she likely did not experience psychotic "delusions." When faced with conflicting evidence, a district court does not clearly err if it adopts a view, as it did here, that is supported by one side of that conflict. *See United States v. Zehm*, 217 F.3d 506, 514 (7th Cir. 2000). And because evidence supported the finding that delusions did not impel Owens's crimes, the district court did not, as Owens argues, impermissibly brush off the question whether they affected her. Rather, the court considered the issue and reasonably concluded that Owens's mental illness did not trick her into committing wire fraud.

Based on this conclusion, the court assigned a top-of-guidelines sentence, citing the seriousness of the offense, the duration of the crime, and her lack of remorse. *See* 18 U.S.C. § 3553(a)(1)–(2). Even a brief discussion is sufficient if this court can discern from it the district court's reasons for imposing the sentence it selected. *United States v. Kennedy-Robey*, 963 F.3d 688, 690–91 (7th Cir. 2020). And the fact that the court also planned to place Owens in a prison that could provide treatment for her genuine mental-health issues confirms that the court seriously considered her arguments about her mental health. 18 U.S.C. § 3553(a)(2)(D); *Kennedy-Robey,* 963 F.3d at 691.

Second, the district court did not substitute the question whether Owens knew right from wrong for the question whether she knew reality from fiction. To the contrary, the court expressly found that Owens "knew exactly what she was doing" at the time that she committed her crimes. True, the court recognized that, after she was caught, Owens may have convinced herself of an alternate version of the events. But it nonetheless decided the relevant issue—Owens's material awareness of reality at the time of commission.

Finally, in sentencing Owens, the district court did not conflate the question of competence to stand for sentencing with the issue of her overall mental health. Though Dr. Correa wrote her report to address the former issue, she also evaluated and diagnosed Owens's mental health. And her conclusions allowed the district court to find reasonably that neither hallucinations nor delusions fooled Owens into taking the money. Based on that permissible finding, the court could then reasonably decide that

Owens's assertions about her delusions (at trial and after) were after-the-fact attempts to "lie her way out" of responsibility for her crime, warranting a sentence at the top of the Guidelines range.

For the foregoing reasons, we conclude that the court meaningfully considered Owens's arguments with respect to her hallucinations and delusions and we AFFIRM the judgment of the district court.